

1 | Plaintiff, Pro Se
2 | 125 High Street
  | Newton, MA, 02464

UNITED STATES DISTRICT COURT
DISTRICT COURT OF MASSACHUSETTS

6 | Frederick L. Runyon, Plaintiff, ) Case No.: ___ _____ ____
7 | vs.                              ) **AMENDED COMPLAINT, INJUNCTIVE**
  | Wellington Management Company,   ) **RELIEF, AND JURY DEMAND**
8 | LLP; Anne Mahoney; Stephen       )
9 | Klar; Defendants                 )
10|                                  )
  |                                  )
11|                                  )
12|                                  )
13| _____ )

## JURISDICTION

16 | 1. The jurisdiction of this Court is invoked pursuant to the Age
17 | Discrimination in Employment Act (ADEA) (29 U.S.C. 621 et
18 | seq.), including the Older Workers Benefit Protection Act
19 | (OWBPA), and 28 U.S.C. § 1331,

21 | 2. Supplemental jurisdiction of this Court is invoked pursuant to
22 | 28 U.S.C. § 1367;

23 | 3. Plaintiff is an individual and resident of Newton,
24 | Massachusetts. Plaintiff's date of birth is May 10, 1952.

26 | 4. Defendant Wellington Management Company, LLP is a corporation
27 | with a principal place of business in Boston, Massachusetts,
28 | USA; Defendant Anne Mahoney is an individual and resident of

Massachusetts; Defendant Stephen Klar is an individual and resident of Massachusetts (hereafter collectively referred to as "Defendants").

5. On February 25, 2013, after having filed a complaint of age discrimination against Defendants with the Equal Employment Opportunity Commission, Plaintiff received from the Equal Employment Opportunity Commission a "NOTICE OF SUIT RIGHTS."

## FACTS AND CLAIMS:

6. Since approximately 1980, Plaintiff has worked in the field of graphic design. His experience in this industry has included positions with magazine and newspaper publishers, advertising agencies, design studios, and corporate in-house marketing communications departments.

7. Since approximately 1995, Plaintiff worked in management-level positions in the graphic design industry.

8. In or about August 1998, Plaintiff began his employment with Wellington Management Company, LLP ("the Company") as Assistant Vice President, Design Manager ("Assistant Vice President"), reporting to the Director of the Company's Electronic Publishing Group, Joseph Kleber. At the time, he was approximately 46 years old.

9. In this newly-created position Plaintiff was responsible for developing an in-house capability for the design and execution of communications materials targeted to clients

and prospects of the Company, as well as internal
materials to support Human Resources and other business
groups within the firm; establishing best practices for
quality and productivity; managing staff designers;
evaluating the performance of staff; and making hiring and
firing decisions.

10. Plaintiff received formal management training through a
number and variety of professional development programs
administered by the firm's Human Resource Department.

11. In or about May 2003, in recognition of Plaintiff's
successful performance, the Company promoted him to the
position of Vice President.

12. In or about September 2006, in further recognition of
his successful performance, the Company promoted him to
the newly created position of Vice President, Corporate
Design Manager.  As part of this promotion, the Company
significantly increased his annual salary and expanded his
responsibilities to include, among other functions,
supervising the design of all of the company's
communications materials across all forms of media,
including web, print, multimedia, and video. A
replacement, Tom Gill, was hired to fill the Design
Manager position vacated by him as a result of this
promotion.

13. In or about December 2008, the Company underwent a reduction-in-force. As part of this re-organization, the Company terminated the employment of, among other individuals, Mr. Kleber and Mr. Gill. As a result, Plaintiff's direct supervisor changed from Mr. Kleber to the Manager of Editorial Services, Brian Johnson, and Plaintiff was assigned direct-report responsibility for the designers formerly reporting to Mr. Gill. This re-organization did not change Plaintiff's purview and responsibilities as Corporate Design Manager.

14. From the start of his employment in June 2007 through approximately December 2009, Mr. Johnson reported to Director of Marketing Services, Lisa Finkel.

15. In or about December 2009, Ms. Finkel left the Company and was replaced by Anne Mahoney, at which point Mr. Johnson began reporting to Ms. Mahoney.

16. At all relevant times, Plaintiff was responsible for overseeing all of the Company's creative design work including work produced by, among other individuals: Julianna Anderson; Donna DeAlmeida; Christine Green; Roseanne Hall; Lisa Hennigan; Mark Kopulos; Andrew Mahoney; Kimberly Olson; Phil Sandoval; Jeff St. Pierre; Wendy Scholes; and Catherine Pipes; as well as design work created for video and all creative design work produced in the Company's global offices.

17.In or about June 2010, Plaintiff had a meeting with Mr. Johnson to discuss workload and to determine what responsibilities might be delegated to staff.

18.During that meeting, Mr. Johnson suggested that Ms. DeAlmeida might be reluctant to assume greater responsibility because of her age, stating words to the effect of: "At this point in her career, I doubt she'd be interested in new challenges." In another meeting later that same year, Mr. Johnson repeated a similar comment about Ms. Green.

19.Both Ms. DeAlmeida and Ms. Green are at least 50 years old.

20.On or about June 1, 2011, Mr. Johnson called Plaintiff to an unscheduled meeting with him and Ms. Mahoney, and Ms. Mahoney explained Plaintiff's position had been eliminated and his employment with the company was terminated.

21.At no point during this meeting did Mr. Johnson or Ms. Mahoney indicate to Plaintiff that his performance was a factor in the termination decision.

22.At no point prior to his termination did Mr. Johnson or Ms. Mahoney or anyone at the Company inform Plaintiff that his job was in jeopardy.

23. At no point prior to his termination was there any comment or suggestion that Plaintiff was lacking skills needed to perform his duties, or was not meeting management's expectations.

24. At no point prior to his termination was Plaintiff provided guidance regarding management's expectations of him, or offered training and/or development opportunities to acquire or improve skills the Company may have deemed necessary.

25. Plaintiff's termination became effective on or about June 15, 2011. At the time of the termination, he was 59 years old.

26. Also on June 1, 2011, the Company informed Ms. Green, Ms. Hall, and Susan Perkins ("the Affected Individuals") that their positions had been eliminated and their employment would be terminated.

27. Like Plaintiff, the Affected Individuals worked under the purview of Ms. Mahoney.

28. Like Plaintiff, Ms. Green, Ms. Hall, and Ms. Perkins are all over forty years old; Ms. Green and Ms. Hall are each at least fifty years old.

29. The Company offered Plaintiff a separation agreement ("the Agreement"), which included a severance payment in exchange for a release of legal claims.

30. The Company's Severance Policy (the "Police") sets forth eligibility requirements, which includes "job elimination."

31. The Policy sets forth a standardized formula for calculating the severance amount for employees who are terminated due to "job elimination."

32. The severance amount offered to Plaintiff as part of the Agreement is consistent with the standardized formula set forth in the Policy.

33. Plaintiff understood the Agreement to be non-negotiable and did not attempt to modify its terms.

34. The Agreement contains two separate provisions entitled "General Release of Claims," embodied in Section 6 and Appendix A, which are inconsistent with each other, creating confusion regarding the nature of the releases to which Plaintiff agreed.

35. The release contained in Section 6 does not refer to the Age Discrimination in Employment Act.

36. The release contained in Section 6 required Plaintiff to release the Company "from any and all … claims related to arising out of your employment or the termination of your employment …."

37. The release contained in Section 6 required Plaintiff to agree to not pursue any individual claim against the Company by filing a charge with any administrative agency.

38. The release contained in Section 6 excludes prospective claims.

39. The release contained in Appendix A referred to the Age Discrimination in Employment Act.

40. The release contained in Appendix A required me to "forever discharge Wellington … from any and all … claims related to or arising out of my employment or the termination of my employment with Wellington."

41. The release contained in Appendix A does not exclude prospective claims.

42. The body of the Agreement does not reference Appendix A.

43. The Agreement does not explain how Section 6 and Appendix A relate to each other, nor did the Company offer any such explanation to me.

44. Plaintiff has no legal training.

45. Upon information and belief, as part of the same employment termination program, Defendants offered a similar severance agreement to Ms. Green, Ms. Hall, and Ms. Perkins in accordance with published company policy.

46. The Company never provided Plaintiff with a list, as required by law, of the other employees in his class, unit, or group who were terminated in the same employment termination program and were asked to sign severance agreements.

47. The Agreement gave Plaintiff 21 days to consider its terms, rather than 45 days as required by law.

48. Plaintiff reasonably relied on the Company's representation that his position had been eliminated in deciding to sign the Agreement on or about June 14, 2011.

49. Following Plaintiff's termination, the Company temporarily re-assigned Ms. Anderson, Ms. DeAlmeida, Ms. Hennigan, and Ms. Scholes to report to Mr. Johnson, and temporarily re-assigned Mr. Kopulos and Ms. Olson to report to Marketing Project Manager John Murphy.

50. In or about October 2011, the Department hired Betsy Salsman as Creative Manager.

51. Ms. Salsman is approximately 20 years younger than Plaintiff.

52. Ms. Salsman's primary duties are so similar to those performed by Plaintiff that they are essentially identical.

53.According to her resume, Ms. Salsman's job history and work experience are so similar to those of the Plaintiff that for practical purposes they are the same.

54.Ms. Salsman oversees the creative design work of the individuals and other groups whose work Plaintiff supervised before his termination.

55. The Company terminated Plaintiff and/or failed to promote him due to his age. If Plaintiff had known that the Company did not actually eliminate his position, but had in fact replaced or intended to replace Plaintiff with a younger employee to perform essentially the same duties and responsibilities as he performed, Plaintiff would not have signed the Agreement.

1

## **Exhaustion of Remedies**

2

3   56.On March 23, 2012, Plaintiff filed a complaint of

4     discrimination against Defendants with the Massachusetts

5     Commission Against Discrimination.

6
7   57. On September 26, 2012, the complaint was referred to

8     the Equal Employment Opportunity Commission. On February

9     22, 2013, the EEOC issued a right to sue letter

10    authorizing Plaintiff to bring his claims in federal

11    court.

12

13    **COUNT 1 — Knowing and Willful Age Discrimination**

14  **Age Discrimination in Employment Act (29 U.S.C. § 621, et**

15                          **seq.)**

16
17  58.By terminating Plaintiff's employment based on his age

18    and replacing him with a much younger employee, and by

19    failing to promote Plaintiff based on his age, Defendants

20    committed age discrimination, causing damages.

21

22          **CLAIM 2 — Age Discrimination**

23              **(M.G.L. c. 151B, § 4)**

24  **59.**By terminating Plaintiff's employment based on his age

25    and replacing him with a much younger employee, and by

26    failing to promote Plaintiff based on his age, Defendants

27    committed knowing and willful age discrimination, causing

28    damages.

1
2
3

## COUNT 3 — Fraudulent Inducement

4
5
6
7
8
9
10

60.By falsely representing to Plaintiff that they were eliminating his position, and knowing that in fact they were actually keeping his job function and replacing him with a younger employee, Defendants knowingly induced Plaintiff through material misrepresentation to sign a release of claims, causing damages.

11
12

## A. Timeline for creating new position

13
14
15
16
17
18

61.Plaintiff's responsibility in thirteen years as a Manager with Wellington includes experience developing descriptions and titles for a number of newly created job positions at the firm, and seeking and obtaining approval to hire from upper management.

19
20
21
22
23
24
25
26
27
28

62.From this experience, Plaintiff knows that the process for creating a new position and hiring into it is time consuming and burdensome. It includes informal preliminary discussions with superiors, obtaining approval to proceed, crafting a job description (entailing several weeks of back and forth between managers and superiors), submission for approval to a formal committee that meets monthly (the "Compensation Committee"). The position is then posted for potential internal candidates, while outside placement firms seek to identify potential external candidates. When

likely candidates have been identified, preliminary
interviews are scheduled. Finalists are then scheduled for
expanded interviews with a broader selection of employees
who will be working with the new hire. This usually
requires candidates to visit the firm more than once to
satisfy the interviewing requirements. Then there is a
formal job offer, which is accepted or negotiated, a
rigorous background check, and finally agreement on a
start date that allows the new hire to provide a minimum
of two weeks notice, often more, to their current
employer. The process described above usually takes months
from preliminary discussions to the day a new hire begins
employment.

63.Plaintiff includes in the attached Affidavit, Exhibit 1,
documents related to the creation of the position of
"Corporate Design Manager" with dates that show a typical
timeline as described above: from early draft of the
request to create a new position, dated November 2005, to
the announcement of a new hire dated September 19, 2006.
In this case there was no search for candidates and no
interviews required because Plaintiff, an internal
candidate, had been pre-selected for the position. The
process took eight months.

64.Plaintiff's thirty two year old replacement, Betsy
Salsman ("Salsman") began employment at Wellington three
months after Plaintiff was terminated. That fact indicates

that Mahoney had planned to replace Plaintiff some time before telling him his position was being eliminated.

## B. Temporary staff assignments pending hiring of replacement

65.Following Plaintiff's termination, four designers who had reported to him were temporarily re-assigned to Brian Johnson, Manager of Editorial and Design Services.

66.On the same date that Plaintiff was terminated, the Web Strategies Team, also in Mahoney's group, was eliminated. The two web designers from that group, whose creative work Plaintiff supervised, were temporarily assigned to report to John Murphy, a Project Manager in Mahoney's group.

67.When Salsman was hired, the designers who had been temporarily assigned to Johnson and to Murphy were permanently assigned to Salsman.

68.That those designers were given only temporary reporting assignments after Plaintiff's termination raises the reasonable inference that before telling Plaintiff his position was being eliminated, Mahoney had plans to hire a replacement to whom those designers would be permanently assigned.

C. Comparison of Plaintiff's Experience to Replacement's Experience

69. Plaintiff has over thirty years of experience in the fields of Publishing, Advertising, Graphic Design, and Marketing Communications. For more than twenty years Plaintiff has held managerial positions in Corporate in-house communications groups in the Financial industry.

70. Plaintiff's experience in the field is broad, having designed and directed creative work for corporate design and global branding needs, including print, web, special events, multimedia, and video solutions.

71. Plaintiff supervised development of the firm's visual identity and maintained design standards supporting consistent representation of the corporate brand in all media. He worked with internal stakeholders to clarify needs, provide guidance, and develop design solutions that focused appropriately on the firm's business goals.

72. Salsman has eighteen years of experience in the field of Graphic Design. For fourteen years she has worked in Corporate in-house communications groups in the Financial industry.

73. Salsman has developed marketing communications plans and programs for financial, retirement and human resource benefits programs and services. She established branding

standards for her employer's outsourcing initiative and maintained consistency across all media, and generated concepts and marketing recommendations to clients and prospects.

74. Salsman's experience does not differ from Plaintiff's in any meaningful way. See Affidavit, Exhibit 2.

D. Comparison of Plaintiff's Job Responsibilities at Wellington to Replacement's Job Responsibilities at Wellington

75. Salsman's job title is "Creative Manager." Salsman does not supervise or manage writing or editorial content, and does not supervise or manage communications strategy. She manages the design staff and oversees the creative visual work product for the firm.

76. Plaintiff's job title was "Corporate Design Manager." The job description for Corporate Design Manager states that the Corporate Design Manager will:

- Serve as the firm's conceptual, collaborative design leader with understanding of design, communications, brand and business strategy to assure image consistency across all media;

- Interact with management at all levels of the firm to consult and advise on the development of new content and

new methods of delivery, and to ensure design solutions are strategic, targeted, and visually compelling

- Set and maintain creative standards for the firm, and contribute to the development and support of best practices related to the creation of communications materials from concept through execution.

- Develop new or improved processes and solutions to leverage capabilities of existing applications and technology as it applies to design and dissemination of communications materials to clients, prospects, and other constituencies.

- Work with Team Managers to ensure that content development is coordinated across different methods of delivery.

- Supervise outside vendors to determine best solutions, timely delivery, and appropriate charges for required work.

77. This description makes very clear that Plaintiff's responsibilities for the design of Wellington's creative product were comprehensive, and included all creative work in all media in all the firm's global offices. See Affidavit, Exhibit 3.

78. Salsman's responsibilities do not differ from Plaintiff's in any meaningful way.

F. Conclusion

79.The totality of the facts described above in Sections A, B, C, and D indicates that when Mahoney told the Plaintiff his position was being eliminated, she knew that representation was false.

80.That misrepresentation was material. Defendants intended that misrepresentation to induce Plaintiff to sign the release, which they expected would shield them from accountability for their discriminatory actions. Having no reason to disbelieve what he was told, Plaintiff actually and reasonably relied on Mahoney's statements when he signed the release, and by that reliance he was damaged with the loss of employment.

81.The totality of these circumstances should invalidate the release of claims that Plaintiff was induced to sign by fraudulent misrepresentation.

## COUNT 4 — Interference with Enjoyment of Rights Protected By Chapter 151B

### (Against Defendants Mahoney and Klar)

82.By causing Plaintiff to be terminated based on his age and replaced with a much younger employee, and by causing Plaintiff not to be promoted based on his age, Defendants Mahoney and Klar interfered with Plaintiff's enjoyment of rights protected

by Chapter 151B, in violation of M.G.L. c. 151B, § 4(4A), causing damages.

## COUNT 5 — Aiding and Abetting Age Discrimination
## (Against Defendants Mahoney and Klar)

83. By causing Plaintiff to be terminated based on his age and replaced with a much younger employee, and by causing Plaintiff not to be promoted based on his age, Defendants Mahoney and Klar aided and abetted the Company's discriminatory treatment of Plaintiff based on his age, in violation of M.G.L. c. 151B, § 4(5), causing damages.

## COUNT 6 - Declaratory Judgment

84. Due to the Defendants' fraudulently inducing Plaintiff to execute the Agreement, and due to Defendants' failure to provide a 45-day period to consider the agreement, and Defendants' failure to provide a list of the other employees in his class, unit, or group who were terminated in the same employment termination program and were asked to sign severance agreements, as required by the Age Discrimination in Employment Act, as amended by the Older Workers Benefits Protection Act, 29 U.S.C. §626, the Agreement is invalid and unenforceable as a waiver of Plaintiff's claims under the ADEA.

## PRAYER FOR RELIEF

85. WHEREFORE, Plaintiff respectfully prays for a judgment against Defendants for Declaratory Judgment and Compensatory Relief as the Court deems appropriate including:

• Reinstatement of employment at a level equal to or above the position last held by Plaintiff, such reinstatement to be considered as uninterrupted employment for considerations of seniority, tenure, vacation qualifications, etc.

• Damages in the form of back pay, front pay, and the monetary value of lost benefits of employment.

• Liquidated damages as the law specifies for acts of discrimination based on age and/or for willful and knowing acts of discrimination based on age;

• Punitive damages and/or liquidated damages as provided by state and federal law;

• Costs and attorneys fees of this lawsuit, with interest;

• Any other relief as the court deems appropriate.

1

2    Dated this  $\underline{26}$  day of March, 2014

3

4

5                                       Fredrick Runyon

6                                       Frederick L. Runyon, Plaintiff

7                                       *Pro se*

8                                       125 High Street

9                                       Newton, MA 02464

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Complaint - 21